
___ FILED ___ ENTERED
___ LODGED ___ RECEIVED

JAN 16 2026


AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND DEPUTY
BY

1:26-mj-0072-CDA

## AFFIDAVIT IN SUPPORT OF A
## COMPLAINT AND ARREST WARRANT

I, Sean O'Rourke, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, declare and state:

## INTRODUCTION

1. I submit this affidavit in support of a criminal complaint and arrest warrant charging **TIAGO ALEXANDRE SOUSA-MARTINS** with violations of the following federal laws:

   a. **Count One**: Title 18 U.S.C. § 111, Resisting, Opposing, Impeding, Intimidating, or Interfering Certain Officers or Employees; and

   b. **Count Two**: Title 18 U.S.C. § 1361, Destruction of Government Property.

### The Subject Offenses

2. Title 18 U.S.C. § 111 criminalizes forcibly resisting, opposing, impeding, intimidating or interfering with any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties. A defendant found guilty of violating these charged acts may be fined under Title 18 or imprisoned not more than one year, or both.

3. Title 18 U.S.C. § 1361 criminalizes willfully injuring or committing any depredation against any property of the United States, or any department or agency thereof. This act is punishable by a fine under Title 18 or by imprisonment for not more than one year, or both.

## AGENT BACKGROUND

4. I am a Special Agent with the FBI and have been so employed since May of 2018. I am currently assigned to the FBI's Chesapeake Bay Safe Streets Task Force ("CBSSTF"). As an FBI Special Agent, I am a federal law enforcement officer pursuant to Rule 41 of the Federal Rules

of Criminal Procedure, meaning a government agent (other than an attorney for the government) engaged in enforcing the criminal laws and is within any category of officers authorized by the Attorney General to request a search warrant.

5.     During my tenure as a Special Agent, I have participated in numerous violent crime investigations including the identifications of violent offenders; interviews and debriefing of suspects, victims and witnesses; and investigations of crimes of violence involving law enforcement officers. I have also participated in the apprehension of violent offenders by obtaining court authorized search warrants of communications accounts, vehicle tracking devices, physical searches of locations and vehicles, and cellular site data.

6.     Based on my training, experience, knowledge, and participation in violent crimes investigations, and the training and experience of other agents and detectives with whom I am working closely in this investigation, I know that:

a.     Persons who commit violent crimes often do so when the opportunity presents itself. Oftentimes, when a law enforcement officer is the victim of the violent crime, the criminal act begins with the perpetrator attempting to either flee or obstruct the officer in the performance of their duties.

b.     The instrumentalities of violent crime are not always relegated to traditional weapons such as guns, knives, blunt objects or fists and feet; but also through other means, such as vehicles. The use of vehicles in violent crimes is difficult to quantify, as reporting related to the use of a vehicle to commit a crime of violence is often reported as an aggravated assault, carjacking, or domestic assault, and the true number is not known.

c.     Law enforcement encounters in the United States often occur on public roadways around motor vehicles. Because of the ease of access and frequent use of motor vehicles by the public, the inherently dangerous nature of operating motor vehicles and the high probability of contact between law enforcement and the public while operating a motor vehicle, I am aware that vehicular assault of law enforcement is a common, if underreported crime.

7.     The information contained in this affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and other individuals assisting in this investigation. Because I submit this affidavit for the limited purpose of establishing probable cause for the issuance of an arrest warrant, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, omitted any facts known to me that would materially detract from a probable cause finding.

8.     Wherever in this affidavit I discuss information resulting from physical observations conducted during this investigation, that information (except where otherwise indicated) does not set forth my own personal observations but rather has been provided directly or indirectly through other law enforcement officers who made those observations.

9.     Unless otherwise noted, wherever in this affidavit I assert that a statement was made, that statement is described in substance as was relayed to me or other law enforcement agents by witnesses and is not intended to be a verbatim recitation of such statement.

10.     Unless otherwise stated, the conclusions and beliefs I express in this affidavit are based on my training, experience, and knowledge of the investigation, and reasonable inferences I have drawn from my training, experience, and knowledge of the investigation.

3

## PROBABLE CAUSE

11.     On December 24, 2025, officers with the Department of Homeland Security ("DHS") Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations ("ERO") ("ERO officers") were performing field operations related to the apprehension and removal of individuals violating United States immigration laws in the District of Maryland. Specifically, six ERO officers spread across five government owned vehicles were patrolling when members of the group observed a white Nissan cargo van bearing Maryland registration 9FA4811 (the "**Subject Vehicle**") in the parking lot of the Lowes home improvement store located at 415 George Clauss Boulevard, Severn, Maryland, near the delivery entrance. An ERO officer reviewed Maryland Motor Vehicle Administration ("MVA") records and learned that the **Subject Vehicle** is registered to Tiago Alexandre **SOUSA-MARTINS** at an address in Baltimore, Maryland. The ERO officers on site obtained a photograph of **SOUSA-MARTINS** from the MVA database and disseminated it amongst each other to aid in identifying him. ERO officers then visually identified **SOUSA-MARTINS** against the MVA photograph as he exited the Lowes and approached the **Subject Vehicle** before entering it. Specifically, one ERO Officer ("ERO Officer 1") had a clear frontal view of **SOUSA-MARTINS**, which Officer 1 relayed to others including ERO Officer 2 and ERO Officer 3. Those officers confirmed that they also made similar observations and believed the individual to be **SOUSA-MARTINS**. An ERO Officer then ran **SOUSA-MARTINS'** information against immigration databases maintained by the Department of Homeland Security ("DHS"). His query revealed that **SOUSA-MARTINS** was listed as a non-U.S. citizen who had overstayed his B-2 visa status since 2008.

12.     ERO officers surveilled and followed the **Subject Vehicle** as **SOUSA-MARTINS** drove it away from the Lowes to the vicinity of West Court, located in Glen Burnie, Maryland.

4

13. ERO Officer 1 and ERO Officer 3 activated the emergency lights and sirens in their vehicles while attempting to stop the **Subject Vehicle** to detain **SOUSA-MARTINS** and determine his immigration status. The **Subject Vehicle** then travelled a short distance before stopping in the parking lot in front of 504 West Court.

14. ERO Officer 1 stopped ERO Vehicle 1 behind the **Subject Vehicle**. ERO Officer 4 stopped ERO Vehicle 4 behind ERO Vehicle 1.[1] ERO Officers 2, 3, and 5 positioned ERO Vehicles 2, 3 and 5 in front the **Subject Vehicle.** ERO Vehicle 5 was offset to the driver's side of the **Subject Vehicle.**[2] The officers did so to confine the **Subject Vehicle** between the ERO officers' vehicles and to attempt to block it from fleeing.

15. ERO Officers 1, 2, 3, 5, and 6 then exited their vehicles. ERO Officers 1, 2, and 5 approached the drivers' side of the **Subject Vehicle,** where **SOUSA-MARTINS** was still inside while ERO Officer 6 briefly checked the passengers' side for passengers/weapons before notifying the other officers that there were none and moving back towards ERO vehicle 5 to allow ERO Officers 1, 2 and 5 to continue to talk with **SOUSA-MARTINS.**

16. All ERO officers were wearing clothing and tactical vests that bore patches identifying them as law enforcement.

---

[1] ERO Vehicle 4 contained a detainee ("Detainee-1") who was in ERO Officer 4's custody from a prior detention that morning before the officers came into contact with **SOUSA-MARTINS.**

[2] ERO Officers 3 and 6 were riding in the same vehicle. All other officers were driving their vehicles alone.



**Photo 1: ERO Officers 1, 2[3] and 5 (at scene). Photo 2: ERO Officers 3, 4 and 6 (at hospital).**

17. The ERO Officers identified themselves as immigration enforcement officers and issued commands for **SOUSA-MARTINS** to exit.

18. Despite being told multiple times to exit the **Subject Vehicle** from ERO Officer 1 and others, **SOUSA-MARTINS** refused. He stated to the Officers *"Why are you doing this? I'm a U.S. Citizen,"* and *"No, I'm not coming out."*

19. After **SOUSA-MARTINS** repeatedly refused to exit the **Subject Vehicle**, ERO Officers 1, 2, and 5 decided to break the glass of the front drivers' side door and attempt to extricate him. According to ERO Officers 1 and 4. ERO Officer 4 tossed ERO Officer 1 a "glass break tool" from his vehicle, which ERO Officer 1 used to break the drivers' side window glass of the **Subject Vehicle**. According to ERO Officer 2, when he attempted to extricate **SOUSA-MARTINS** from the **Subject Vehicle**, **SOUSA-MARTINS** stated, "Fuck this," then placed the **Subject Vehicle** in drive, travelling a short distance forward.

20. According to ERO Officers 2 and 5, they reached into the drivers' side of the **Subject Vehicle** after **SOUSA-MARTINS** put it into drive so they could attempt to manipulate

---

[3] As visible in the photograph, ERO Officer 2's vest has a body worn camera mounted to it. According to the ERO Officers, the camera was not in operation due to a dead battery. ERO Officers had attempted to operate the camera earlier in the day while detaining Detainee-1 and learned that the battery was dead at that time. The other ERO officers had not yet been issued body worn cameras at the time of the events described herein.

the gear shift of the vehicle to prevent **SOUSA-MARTINS** from operating the **Subject Vehicle** further. According to the officers, **SOUSA-MARTINS** then drove the **Subject Vehicle** back and forth, causing both ERO Officers 1, 2 and 5 to move away from the **Subject Vehicle**. During the **Subject Vehicle's** maneuvering, ERO Officer 4 exited ERO Vehicle 4 to assist.

21. **SOUSA-MARTINS** then placed the **Subject Vehicle** in reverse and backed into ERO Officers 1's vehicle that had been parked directly behind it. According to ERO Officer 1, there was a loud squeal from the tires of the **Subject Vehicle,** which caused him to believe that **SOUSA-MARTINS** was intentionally backing up at a high rate of speed into the Officers' vehicle before striking it.

22. **SOUSA-MARTINS** continued driving the **Subject Vehicle** in reverse after striking ERO Vehicle 1, causing ERO Vehicle 1 to be pushed back and to strike ERO Vehicle 4. Detainee-1 was still inside ERO Vehicle 4 at that time.

23. **SOUSA-MARTINS** then drove the **Subject Vehicle** forward in the direction of the ERO Vehicles 2 and 3, and in the direction of the Officers who were standing in front of him.

24. In between the **Subject Vehicle** and the ERO vehicles, located in front of and along the drivers' side, were ERO Officers 1, 2, and 5, who were all on foot and stated they were in close proximity to the **Subject Vehicle**. ERO Officers 3 and 6 were farther away, in the vicinity of ERO Vehicles 3 and 5.

25. Detainee 1 – whom has been interviewed by law enforcement – has stated that the **Subject Vehicle** struck ERO Vehicles 1 and 4 twice in total.

26. The ERO Officers stated the **Subject Vehicle** struck ERO Vehicles 1 and 4 multiple times.

27.    Based on my training and experience, I know that it is normal for multiple witnesses to a dynamic, high-stress situation to recall discreet details differently. Based on my review of the ERO Officers' statements and the statement of Detainee 1, as well as photographs of the damage to ERO Vehicles 1 and 4, I believe that there is probable cause that **SOUSA-MARTINS** utilized the **Subject Vehicle** to strike ERO Vehicle 1, which caused ERO Vehicle 1 to then strike ERO Vehicle 4.



**Photo 2: Rear-end damage to ERO vehicle 1 with ERO vehicle 4 in foreground. Photo 4: Front-end damage to ERO Vehicle 1 with ERO vehicle 4 in background.**

28.    According to ERO Officers 1, 2 and 5, the **Subject Vehicle** moved forward in their direction at a high rate of speed after initially reversing into ERO Officer 1's vehicle. According to ERO Officer 1, the **Subject Vehicle** was moving directly towards ERO Officer 2, who was attempting to move out of its way by moving along the front wall of 504 West Court.

29.    ERO Officer 1 drew his firearm and fired approximately one to two shots at the drivers' side of the **Subject Vehicle**. According to ERO Officer 2, when the **Subject Vehicle** began moving forward, he could see the front of the vehicle coming at him (ERO Officer 2) at a high rate of speed. ERO Officer 2 believed that he would be imminently struck by the **Subject Vehicle** and drew his firearm, discharging multiple shots into the front passengers' side of the

8

**Subject Vehicle.** As ERO Officer 2 did this, he moved along the outer wall of 504 West Court, while attempting to avoid being struck by the **Subject Vehicle.**

30. **SOUSA-MARTINS** then continued to drive the **Subject Vehicle** past ERO Officer 2, making a right-hand turn between 504 and 496 West Court. In doing so, the **Subject Vehicle** actually left the road and drove onto grass and a pedestrian walkway in the space between the two residential buildings (see photo below).

31. According to ERO Officer 2, once the **Subject Vehicle** moved past him, he holstered his firearm as he believed that the **Subject Vehicle** no longer posed an imminent threat to his life. ERO Officer 2 stated that shortly after the **Subject Vehicle** had passed him and made the right-hand turn, he heard a sound of "crunching" metal, followed by a loud crashing sound. ERO Officer 1 also visually observed the **Subject Vehicle** make the turn between 496 and 504 West Court.



Photo 3: Wide angle of the pedestrian walkway that the SUBJECT VEHICLE drove on with broken glass from the Subject Vehicles' driver side window in the foreground. Also pictured is a civilian vehicle that was parked at the location at the time of the incident.

9

32. After making the right-hand turn between 496 and 504 West Court, the **Subject Vehicle** continued travelling down a pedestrian sidewalk between the buildings and then struck a fence, before crashing into a tree.

33. ERO Officers 1, 2, 3, 5 and 6 all ran to the **Subject Vehicle,** to apprehend **SOUSA-MARTINS.**

34. ERO Officer 4 remained with Detainee-1, who had been seated in ERO Officer 4's vehicle when it was struck by the **Subject Vehicle,** and who was complaining of neck pain from the impact to ERO Officer 4.

35. According to ERO Officer 1, upon arriving at the drivers' side of the **Subject Vehicle,** he attempted to extricate **SOUSA-MARTINS** but could not unlock the door to do so. ERO Officer 1 then ran to the passengers' side and, with the help of another ERO Officer, was able to grab **SOUSA-MARTINS** under his armpits and drag him out to the ground. Upon doing to, ERO Officer 1 felt warm liquid on their arms and hands and determined that **SOUSA-MARTINS** had been shot. ERO Officer 1 placed **SOUSA-MARTINS** on his left side in a "recovery position" where he observed an entry wound on **SOUSA-MARTINS'** right side, under his arm pit. ERO Officer 3 then began packing gauze into the wound and applying pressure while checking for other wounds. ERO Officer 1 then called 9-1-1 to request medical aid to the location.

36. According to ERO Officer 2, upon arriving at the **Subject Vehicle** following the crash, he observed that while the vehicle was stopped, its wheels were still spinning. Believing that the spinning wheels posed a safety issue, ERO Officer 2 entered the **Subject Vehicle** from the passengers' side and placed the vehicle in park. ERO Officer 2 then asked ERO Officer 3 if they need any additional medical supplies and returned to their vehicle to locate a second first aid bag.

37. According the ERO Officer 5, he was one of the first to arrive at the **Subject Vehicle** following the crash where they attempted to extricate **SOUSA-MARTINS**. According to ERO Officer 5, when he first encountered **SOUSA-MARTINS**, **SOUSA-MARTINS** was holding a saw of some kind. ERO Officer 5 removed the saw from **SOUSA-MARTINS'** hands and attempted to lift him from the **Subject Vehicle**. **SOUSA-MARTINS** appeared to be holding on to something with his right hand that ERO Officer 5 could not see and kept his limbs tight to his body. ERO Officer 5 stated that they believed that this posture was an attempt by **SOUSA-MARTINS** to keep ERO Officer 5 from removing him from the **Subject Vehicle**.

38. Following the crash of the **Subject Vehicle**, and the extrication of **SOUSA-MARTINS**, ERO officers directed members of the Anne Arundel County Police and Fire Departments, to the West Court location. Upon arrival of Anne Arundel County Emergency Medical Services ("EMS") **SOUSA-MARTINS** was transported to the R Adams Cowley Shock Trauma Center located at 22 South Greene Street, Baltimore, Maryland, for non-life-threatening gunshot wounds to the shoulder and thigh areas.

39. Following the transport of **SOUSA-MARTINS**, members of the Anne Arundel County Police Department began isolating and containing the area around 500 West Court. Forensic units responded to take photographs and collect evidence, and a witness canvass was performed. Photographs of the **Subject Vehicle** were taken, and it was initially towed to the Anne Arundel County Police Department Headquarters. The **Subject Vehicle** was transported to the Baltimore FBI field office located at 2600 Lord Baltimore Dr, Windsor Mill, Maryland for the actual search and analysis.

40. The U.S. Government owned ERO Vehicles 1 and 4 were transported by ERO Officers from the scene for damage assessment. ERO Vehicle 1, which is a Dodge Caravan that is

11

owned by ICE and assigned Vehicle Identification Number ("VIN") 2C4RDGBG1GR152075, was assessed as sustaining damage in the amount of $7,364.88 United States Dollars ("USD"). ERO Vehicle 4, which is a Dodge Caravan that is owned by ICE and assigned VIN 2C4RDGBG8GR139341, was assessed as sustaining damage in the amount of $9,530.39 USD. The assessments for the damage to the ICE vehicles was assessed by a commercial auto body collision repair shop located in Baltimore, Maryland.

### *Account of Tiago Alexandre SOUSA-MARTINS*

41.     On January 5, 2026, I interviewed **SOUSA-MARTINS** to ascertain his account of the events of December 24, 2025. After being advised of his legal rights, **SOUSA-MARTINS** waived them and agreed to speak with me.

42.     **SOUSA-MARTINS** came to the United States from Portugal in 2008 to visit his father. According to **SOUSA-MARTINS**, upon completion of his visit, his father told him that he was "not going back" to Portugal. **SOUSA-MARTINS** stated that he believed that his father kept him in the United States as a dependent for tax purposes.

43.     **SOUSA-MARTINS** spent his high school and young adult years in Newark, New Jersey, before moving to the Baltimore area sometime before 2020. **SOUSA-MARTINS** was aware of his immigration status growing up, noting that he did not have a social security number, which precluded him from scholarships and other opportunities. **SOUSA-MARTINS** worked in several occupations, had purchased a home and had taken steps to begin the process of becoming a United States citizen but had not yet been granted citizenship.

44.     According to **SOUSA-MARTINS**, on December 24, 2025, he had just parked the **Subject Vehicle** in front of 504 West Court to perform electrical work, when a dark vehicle with

12

flashing lights pulled in behind him[4] and an unidentified male approached from the rear, yelling "We've run your tags, we know you're an overstay- we're going to break the glass" in Spanish.[5] Several other un-marked vehicles with flashing lights also pulled in in front of the **Subject Vehicle** and the individuals driving those vehicles stepped out. According to **SOUSA-MARTINS**, he initially believed that the individuals driving the car were police officers stopping him for a traffic infraction but noticed that the men were not wearing uniforms like he had expected from police officers, but firearms were visible on their person.

45. **SOUSA-MARTINS** stated that upon contact with the men, he began speaking English, stating "I speak English, what is this about?" While **SOUSA-MARTINS** initially believed that the individuals were initially local or state law enforcement, he stated that the word "overstay" led him to believe that the men were with Immigration Enforcement. According to **SOUSA-MARTINS**, he attempted to de-escalate by speaking English because the men seemed angry and "at a 10" in intensity. Following a brief verbal exchange with the men, the drivers' side window of the **Subject Vehicle** was shattered by one of the men.

46. According to **SOUSA-MARTINS**, at the time of the glass breaking, he noticed a walkway through 504 and 496 West Court and made the decision to drive the **Subject Vehicle** through that walkway, believing that he would be shot by the men. **SOUSA-MARTINS** was unable to recall if the **Subject Vehicle** was still parked, in drive or reverse when he made the decision, but remembered driving on the walkway, away from the men. **SOUSA-MARTINS** did not recall hearing any shots being fired from the men surrounding the **Subject Vehicle**.

---

[4] The SUBJECT VEHICLE is a cargo van and therefore, there is no rear-view mirror: only side view mirrors. Sousa-Martins observed the first officer from his drivers' side view mirror.

[5] Sousa-Martins is fluent in Spanish, English and Portuguese.

13

47.    Upon driving the **Subject Vehicle** through the walkway between 504 and 496 West Court, and clearing the other side, **SOUSA-MARTINS** began to feel weak and noticed blood on his upper thighs. Immediately after, the **Subject Vehicle** crashed into a tree and came to a rest. **SOUSA-MARTINS** was the pulled from the **Subject Vehicle** by some of the men and placed on the ground. One of the men remained with **SOUSA-MARTINS** and made sure he was "relaxed and breathing," while the other men began calling for an ambulance. **SOUSA-MARTINS** was transported to Shock Trauma Emergency Medical Center in Baltimore, Maryland, where he was treated for gunshot wounds to his left thigh and upper back on the right side. **SOUSA-MARTINS** recalled that he was told by medical personnel that his right lung had collapsed.

48.    Once in stable condition at the hospital, **SOUSA-MARTINS** noticed that some of the men from 504 West Court were in the hospital with him, and that their clothing bore patches that read "ICE" and/or "Police." **SOUSA-MARTINS** also learned that there was a second person at the hospital who had been previously detained by the officers earlier in the day that was being treated for injuries.

### *Account of Detainee-1*

49.    According to Detainee-1, he had been detained by ERO Officers, in Southern Maryland, prior to the ERO Officers encountering **SOUSA-MARTINS** and the **Subject Vehicle**. Following his detention, Detainee-1 was restrained in handcuffs and placed in the back seat of an ERO Officers' vehicle.[6] There were other ERO Officers in other vehicles along with the vehicle that he was detained in, which Detainee-1 described as two (2) black vans, one Dodge Charger, one Ford Explorer and two other vehicles with makes and models he couldn't describe. After an

---

[6] According to interviews of the ERO Officers, Detainee-1 was detained in ERO Officer 4's vehicle.

hour of driving to various public locations in a "caravan," the ERO Officers arrived at the parking lot of a Lowes home improvement store.

50. According to Detainee-1, once the officers arrived in the parking lot of the Lowes, they remained there for approximately ten minutes, while watching a white cargo van, later identified as the **Subject Vehicle**, and a man who had gotten into it, later be identified as **SOUSA-MARTINS**. The officers then followed the **Subject Vehicle** to an apartment complex where they pulled it over. Visible to Detainee-1 were the two vans, to include the van he was detained in, which were parked behind the **Subject Vehicle** and two of the ERO vehicles that had pulled in front of the **Subject Vehicle**. Upon pulling the **Subject Vehicle** over and blocking it in, all officers exited their vehicles and surrounded the **Subject Vehicle**. ERO Officer 4 also stepped out of his vehicle, however, remained near the open drivers' side door.

51. According to Detainee-1, all officers were wearing tactical vests and face coverings and identified themselves as "immigration" and "police." Furthermore, the officers could be heard telling the driver of the **Subject Vehicle** to provide them with identification and to step out. After approximately one minute, the officers informed the driver that they would break the window glass. Detainee-1 then observed ERO Officer 1 break the drivers' side window glass of the **Subject Vehicle**.

52. Detainee-1 further stated that following the breaking of the glass, the driver of the **Subject Vehicle** reversed into the ERO vehicle that was parked directly in front of the ERO vehicle that Detainee-1 was seated in. The **Subject Vehicle** then drove forward, a short distance before backing into the ERO vehicles again. According to Detainee-1, the **Subject Vehicle** then drove forward.

15

53. According to Detainee-1, he then heard several gunshots and, following the gunshots, saw the **Subject Vehicle** drive between two buildings on the right. ERO Officer 4, who was with Detainee-1, then called 9-11 on his cell phone while the other officers ran in the direction of the van, which was now out of sight to Detainee-1. Detainee-1 was able to see the driver transported away from the scene in an ambulance before he was also transported by ambulance to a hospital for treatment for whiplash.

## CONCLUSION

54. I request the Court issue the requested Complaint and Arrest Warrant.

Respectfully submitted,

*Sean P. O'Rourke*

Sean O'Rourke
Special Agent
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this __15th__ day of January 2026.

The Honorable Charles D. Austin
United States Magistrate Judge

16